You can start by, why not explain why the garlic was so expensive at the retail end? Because the, as we stated in our briefs before this court and the lower court, the sales manager of the importer looked at what the retail prices by the grocery stores were and it had an idea of what a reasonable profit was for the retailers. It deducted that, it came up with the difference and so it thought it could charge the prices that it did given that market analysis. So this issue concerns a couple things. Number one is the legal test. The legal test to the price, the quantity, anything else that is relevant is extremely distortive. And there are a couple of CIT cases that I cite in my brief, Hebei, New Donghua, and American Silicon that stand for that proposition and it's consistent in the lower court. It has to be extremely distortive from any other value, not from some average, not from something unrelated and irrelevant. Do we have a precedent, a case that says that the test is extremely distortive? Those two cases, both CIT cases. Which ones are those? It's Hebei, New Donghua, I cite it in my case, in my brief, and the other one is American Silicon, which in turn cited another case. And those state extremely distortive from any other value. So the question is, do we have any other value on the record? And yes, we do. Before I get to that, however, I would like to address the average unit value used by the Commerce Department. The average unit value refers to the customs data, customs or CBP, Customs and Border Protection, to their data that that data, what Commerce typically does and did it in this case, was use not a range of prices or quantities that's in that data, and there are thousands of entries in the database, but used what they call it for price, an average unit value, took a simple average. And we argued at the lower court that that is wrong for two reasons. It's wrong because we're looking at any value according to these two court cases, not an average. Any value is a range. It's all the values on the record. That's number one. Number two, what's dispositive of Chengda's future behavior is not what thousands of other Chinese exporters sell garlic at to the U.S., but of its own activities. And there are two instances here on the record of its own activities that demonstrate these prices were not extremely distortive. One is its sales price of the peeled garlic to Japan, and the other is simply the three arm's-length transactions that are at issue in this case. They're self-corroborating. They all had identical prices and similar quantities. And unlike one case, well, and that's related to the Chengda's own behavior, okay, that's more dispositive than these thousands of other sellers. And this is, Commerce's ability to do this is, and their practice of doing this, is seen in two other court cases, Tianjin and Catfish Farmers. Are you saying that there were others importing that were selling it at a higher price? No, no, lower price. But were they all lower price? But the activity to the... Were they all lower price? Yes. Okay. And the record shows it was at a much, much lower price. Yes. And your average unit value was four times higher than that index used by the Department of Commerce. Yes. So compared to everybody else, that price is a bit of an outlier. There's nothing else at the other end of the spectrum. That's correct. But the practice and the courts have ruled that you have to look at the behavior of the company, of Chengda, that that's more dispositive. And here, they had sales to Japan. Sales to Japan virtually equaled the import price into the U.S. to the related importer. Sales or a sale? A sale. A sale. Yes. That sale to Japan was only 4% different from the price to the importer. The importer then resold to three grocery stores at a much higher price. Yes. But what the substantial evidence on the record shows that Chengda's own behavior, its sale to Japan and the three arms-length transactions to the grocery stores... On the same day. Yes. And Commerce makes a big point of that, that in the Windmill Court case, the court looked at sales to the U.S. and found them to be dissimilar. And so rejected those, that they could not corroborate each other. Here in our case, they are similar, but Commerce still has a problem. I mean, we're damned if we do, damned if we don't. If we're dissimilar, can't use them if we're similar. Is there a reason why all those sales and other purchases all happened on the same day at the 11th hour of the review period? Well, there's no bright line test. Yeah, I'm just asking why did it happen like that? Well, this happens in virtually all new shipper reviews, that as you get toward the six-month deadline to request a review, more activity starts. You know, a Chinese company or any foreign company decides, oh, we better... This is common? To have sales in the last month, in the last month of the period of review? And the amount, and what happened here, you think is a common practice? All on the same day? Sure. I mean, this is fresh produce. It's going to spoil. And Commerce makes a point of making three sales in a day. How dare Qing to do that? But what company can exist if it makes two sales a day? But Commerce made its analysis under the totality of the circumstances. And this was just, you know, you have an average unit value that's four times higher than the index used by Commerce. You have all the sales that are made on one day, went straight from the importer to the retail outlets. The prices sold to the retail outlets are much higher. In fact, I don't think that Commerce found any sell in its entire review in the garlic cases that had as high as prices as your sales. You're affiliated to the importer. You purchased the importer practically also during this time that you're constructing the sales. So we're looking at Commerce's view of the totality of the circumstances. How is that wrong? And how is that normal in new shipper reviews? Are you saying that all of this is normal in new shipper review cases? I can't speak for all new shipper review cases. But what I can say for this case, for this company, for this set of facts, that the sales, the three sales to the U.S. were arm's length transactions freely made by the unrelated grocery stores. And that it's in line with their other activity, with their sales to Japan. And if you took the sales to Japan, the sale to Japan, which Japan does not have a dumping order, if you added the $4.71 cent countrywide per kilogram, countrywide value assessed by Commerce as the countrywide rate for China, you add that $4.71 cent to the Japan price, that price is higher than the three sales to the grocery stores. Also Commerce found that when it took the grocery store prices and it tried to deduct certain transportation and related expenses, it still found that compared to the Japan sale, the Japan sale unadjusted for any cash deposit, that the U.S. prices were still higher than the Japan, but they were only about 25% higher, which while I disagree with their methodology, why is 25% profit extremely distortive or why is that a problem? Again, there's no bright line test here that, if you sell three weeks before the end of the period of review, it's illegal, there's no bright line test. If you make a 25% profit, it's against the statute. These are all just made up feelings by the Commerce Department to justify for its rationale to make that decision. Why don't we hear from the other side to start to do rebuttal time, and we'll save you rebuttal time and hear from Mr. Vine. You're going to save three minutes for your friend, right? Yes, Your Honor. May it please the court. The judgment of the trial court should be affirmed, and Commerce's rescission of the new ship for review should be sustained. We're looking here, as Your Honor stated, is the Commerce's analysis of the totality of the circumstances in its new shipper review. I should preface by saying a new shipper review is a special type of review. New shipper reviews don't come before this court very often, but it's an opportunity for a new shipper to establish its own. It's a special proceeding for these new shippers. It's not a typical review, giving this new shipper an opportunity to establish its own dumping rate. And then in allowing that new shipper to provide this information to Commerce, in this particular instance with Chengda, Commerce looked at the price and the quantity and the timing of the sales, which is consistent with its totality of the circumstances test. As Your Honor noted, the transfer price itself was extremely high, much higher than any other price that was charged in the U.S. market. And then Commerce noted the retail prices, all on the same day, all for the same price, was even more extremely higher. But your friend has a concern, and I guess I get it at some level, which is, and it may be inherent when you have a totality of circumstances test, which is it's hard for people on the outside to know really what the guideposts are. And it seems like there's no firm standards. You look at these factors and totality, this one would be less and this one more, and that doesn't give much guidance, does it, to the importers in circumstances such as this. Well, I would make the point that Commerce's test, the totality of the circumstances test is well documented. Commerce typically looks at price, quantity, timing of the sales, exactly what Commerce did in this case. This is not factors that Commerce hasn't expressed in the past. And Commerce also has stated, and the trial court has affirmed, that other factors may play a part, but we're still talking about price, quantity, and timing of the sales, just looked in almost any bona fides analysis. Also, Commerce is not expecting the importer, the new shipper, to align itself with the average unit value itself, that specific value. What Commerce is looking at is to see whether the new shipper has aligned itself with the market, if it's market price that's consistent with their market values. But it's not artificially structured such that the new shipper would attempt to benefit from its own low dumping margin that would not indicate its future business practices, and then obtain a competitive advantage over other importers that had imported at that time and had a substantially higher dumping rate. I guess to follow up on Judge Post's question, what would have satisfied Commerce? I mean, right now you're basically assigning an intent to this party, and that can be hard to do at times, and it's hard to know where the line is. I mean, what's the most glaring feature that you're hanging your hat on here? Is it quantity, or is it really price? If the price had been brought down more within, I don't know, one or two standard deviations to the AUV, and it was the same quantity, would that be okay? I can't speak for what Commerce would say, but the trial court and Commerce have both— You know, businesses have a right to organize their affairs and try to understand what's good and what's not good. Certainly, certainly, Your Honor. But the trial court and Commerce have both stated that price, for example, informs the rest of the analysis. I don't think there would be any argument that looking at prices that are this dissimilar from other importers, that this gap in prices is somehow different, that this would be something that Commerce would sometimes accept. But in those circumstances, maybe there would be other circumstances that would explain that high price. But again, it is— It seems to me that this isn't so much a subjective test. And that indicators are unknown or unreasonable, or invisible, rather. I mean, Commerce is looking at whether the transaction is commercially reasonable. And so it's got to be reflective of commercial realities. Absolutely. And pricing is out there, and Commerce has captured the prices. But the real test is whether these are sales that indicate future activity by the new shipper. Precisely. And Commerce found it was unreasonable to say that, for example, that these high prices could be maintained in the future if everybody else is selling at a much, much lower price. Then it's unreasonable to say that these prices are going to be maintained in the future. So the only thing the high prices do is take the new shipper out of the dumping order. And that's what Commerce is looking at. Precisely. Precisely, Your Honor. And again, Commerce doesn't limit its focus just on one factor. In fact, the trial court has held many times, if there's just one factor alone, that would not support the analysis. But Commerce goes past one factor, looks at several factors, looks at it, and has enumerated it. These are factors that it looks at in almost any bona fide analysis. The concern I had with the factors that Commerce applied, it goes to quantity. And found that this is unreasonable to have such a low quantity shipped. But if you're a new shipper, is it reasonable to ship a large quantity? What was unreasonable about the quantity that was entered? So that's one of the factors that Commerce looks at is quantity. And it is in the past that Commerce has found when there is just the indicator that you have that a new shipper has imported a very small quantity. If there are other indicators that say, well, this is just a typical new shipper import because it's a new shipper, that doesn't necessarily indicate under the totality of the circumstances that the sale was artificially created. But in combination with other factors, such as the high price, such as the timing of the sales, that actually the number in the sale can call into question the bona fides of the sale itself. It's not that Commerce, per se, sees that the quantity is low and says, well, that definitely means it's not bona fide. Understands that there are circumstances in which a new shipper would sell a small quantity. Suppose it's a small exporter. Certainly. Someone who's trying to break into the export market. Certainly. And if there were no other factors, if there were no other factors that Commerce looked at and said that would indicate that that small quantity perhaps is just because the new shipper is new, then it would perhaps pass the smell test. And it has happened in other reviews and decisions that have come before the trial court. But this isn't what happened in this case. What happened in this case is that Commerce said, well, this factor of price is very, very high, and we have no way of explaining why this is so high. The quantity is very, very low. In combination, those two factors together show us that we're going to look past those two factors as well. Look at the timing of the sales, as the owners have already discussed. Look at the timing of the sales and said, well, look, these three retail sales were all on the same day, all for the same price. It was very, very high. And in combination with that, there was a period of two months prior to the end of the period of review. I wasn't finding that Commerce said it was commercially unreasonable to have the sales made on the same day. It seems to me that that's fairly typical also. You take an order, set it a price for future shipment, you grow your garlic, or you get it ready for shipment, and by the time it goes, I mean, you move it along. This is a purchasable item. Why is it unreasonable that the importer never took the goods in question but simply forwarded it on to the retailers? Well, perhaps if there were not such striking similarities, then Commerce wouldn't have called it into question. But the fact that these sales were all for the very same price and it was very, very high, and all on the same day, it just showed to Commerce, it demonstrated to Commerce that it was more likely than not that these were artificially structured. But that was also in the context of the record as a whole under the totality of the circumstances. Like I said, if you looked at these in isolation, it could be that the rest of the evidence on the record demonstrates to Commerce that perhaps, and I see I'm almost to three left, and so I don't want to... No, we started you at 12. Okay. Oh, I see, so the three is for me. Okay, I apologize. That perhaps each of these factors in isolation would be such that if there are other indications on the record to Commerce, again, other indications on the record to Commerce that would indicate the sales are bona fide, and there's a reason for them that indicated why these sales happened. But that isn't in this case. This is a case in which Commerce saw fact after fact after fact that when taken together, indicated that these sales were artificially structured. And there isn't an intent... Going back to your comment earlier, Judge Chen, Commerce is not ascribing an intent, a sinister intent to these new shippers. This is a test that it applies to every new shipper that has a small set of sales, or one single set of sales that may call the bona fides into question. It does this analysis to make sure that sale is commercially reasonable. It's not a way of finding and ascribing some intent to evade the dumping order. It's a fair test to apply to each new importer, I guess is what the answer I would have for that. I always thought that the test that Commerce should apply to new shippers should be high because you can come back later on in a review and pick up whether in the future dumping the new shipper has engaged in dumping. Why isn't the administrative review process enough to satisfy these concerns you're talking about? The administrative review process to capture the bona fides of sales and importers... Let's say that in the future, the new shipper does engage in dumping. Why wouldn't that be caught under the administrative review process? Well, I mean, it would. That's what you're looking for. You're trying to prevent circumvention of the duty order. Right, but the purpose of the new shipper review is actually for the benefit of the new shipper. Commerce conducts these new shipper reviews because the statute provides for shippers that did not exist or were not importing when the investigation or order was implemented a chance to come in and demonstrate its own dumping margin. What happens here is that, let's say that the new shipper created this artificial sale. What it could do during that time period, and usually administrative reviews can last anywhere up to two years, benefit from this cash deposit rate. And the cash deposit rate would allow it, very low cash deposit rate, would allow it an unfair competitive advantage not only over its fellow importers and exporters, but also just to be able to sell at more dumped prices without the consequences. But you're right, Your Honor, that is also captured by the administrative review. But I would make the one quick point that not all sales are reviewed during administrative review. Typically, you have a mandatory respondent or a group of mandatory respondents whose sales are analyzed for the bona fides of those sales. Whereas in new shipper reviews, that's, excuse me, for the remaining companies, their sales aren't analyzed. They're given the separate rate or the China-wide rate. And for these reasons, we respectfully request the Court to defer the judgment of the trial court. Thank you. Thank you. I'm Michael Corsi for the Applees, the private industry, the petitioners, the California Fresh Garlic producers. Let me just have a couple of moments to speak. And the government's brief is excellent here. Commerce did a tremendous job below on this issue. And the trial court has a very thorough opinion. Let me start where Judge Reina asked his question. The whole problem commerce faces with these new shipper reviews is they're confronted with typically a high price, low volume sale to get a zero cash deposit rate. That's the goal. And once that rate is gotten, it can't be taken back for at least two years. And commerce has done hundreds of these. Most of them Chinese. It's public knowledge. Pick up, you can Google it anywhere. Huge cheating has been done by those exporters, many exporters, not all, who get zero rates. They slam product in and they disappear. The administrative review starts, they don't show up. There's no cash there. When commerce hits them with the adverse facts available rate for not participating, customs issues tens of millions of dollars in bills that are never collected. And the domestic industry is injured. The remedial relief that the order is supposed to give is taken away. So commerce is cautious. And let me just, one last point. The whole sort of money ball here is price. If the price doesn't look suspicious, the thing ain't going anywhere, okay? Mr. Kinkel says it's unfair to use these customs prices when the exporter doesn't know what these are. That is not the point. This is a commodity product. Every month, the commerce department in a different section comes out with, I am 146 stats, which give for the commodity peeled whole. Volume and value of all entries. It's like a billboard. Everybody knows what the price of this commodity is. The question is who in their right mind would pay this much money for product they can get at half, a third, quarter the price from anywhere else. Once commerce sees that, they get suspicious. Okay, let's look at the next step. How big was the quantity? Pretty small. Other terms, timing of the sales. This all builds into the totality. And what Judge Eaton recognized and commerce itself recognized is not any one of these wins the day. And certainly, commerce does not routinely find these kind of sales to be non-bona fide. Thank you. Thank you. Mr. Kenkel, I think you have some time left. Thank you, Your Honor. I'd just like to make a couple of points. We talked about price. Let me discuss quantity and the timing of the sale. As the court knows, totality of the circumstances is the general test. Concerning each of those factors, commerce had problems with three factors. I think there were five that they looked at all together. Each of these factors, factors have to be looked at individually. Only when a factor is seen to have a problem and if there's more than one, they are summed. Then they compare that to the totality of the circumstances. One can't say, oh, this kind of looks suspicious. This looks suspicious. That looks suspicious. Therefore, three suspicious equal the totality of the circumstances and Chengda loses. They have to look at each one. Quantity, for example, it was within the range of the customs data. It was not an outlier. It was at the very, very low percentile of customs in terms of quantity and shipments. That's true. But the CIT itself has said, has to be extremely distorted. Your price is at the highest range and your quantity is at the very lowest. But the lower court itself has stated, has to be extremely distortive and not related to any value. Here, it's within the values. Sure, it's small, but it still meets the CIT's own test. How do you answer Mr. Corsi's argument that you're looking at prices published by the Department of Commerce and the Department of Agriculture on fresh garlic and it gives you a price and your price is way above that. A reasonable business person would buy it at commercial prices, at existing prices. What's your argument that supports that commerce can expect to find that you're going to continue to sell at this high price in the future? Very simple. Appleton oranges, it's a different level of trade. The import data is showing prices from the foreign exporter to the U.S. importer. The U.S. importer then sells to the next level. And there may be a couple levels, but certainly he's going to sell either to one level and then to the retailers or directly to the retailers. After it enters the U.S. and therefore not subject to the customs data, somebody is making huge profits. It's that simple. And one can argue that it's the retailers or it's the importers. Who knows? I mean, every case varies, I'm sure. But that comes after the customs data. It's a different level of trade. And regarding the timing, it's irrelevant, this issue. It's a red herring. It's not going to be replicated in the future. So it can't be dispositive of the future. Cheng is not going to go out and buy an importer every year for every administrative review to sell again to the U.S. It has a related importer. It's going to stick with it. The fact that it all happened at the end of the POR, again, most, I'd probably say 90% of all sales in a new shipper review over the last 33 years that I've been practicing has been in the last month of the POR. If you want to show that your entries are bona fide, why not enter through your affiliated importer and one that's not affiliated? Well, that was the decision by the company. I can't, you know, it's hard to get clients, to get customers. But the point here is certainly the quantity meets the test. The timing of the sale is just irrelevant. That means if you have any issue out of these five, it's price. One factor out of five, does that equal the totality of the circumstances? That's the bottom line here as Cheng sees it. I think we have your argument. We thank both the council. The case is submitted.